UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| DARRYL ASHCRAFT | CIVIL ACTION NO. 22-cv-329-SDD-RLB |
| VERSUS | Judge Shelly D. Dick |
| CANTIUM, LLC, ALLIANCE ENERGY SERVICES, LLC, AND ABC INSURANCE COMPANY(S) | Magistrate Judge Richard L. Bourgeois, Jr. |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Cantium, LLC ("Cantium") respectfully submits it is entitled to summary judgment pursuant to the "independent contractor defense" under Louisiana law or, alternatively, the general maritime law.

### I.    BRIEF OVERVIEW OF ARGUMENT

Plaintiff, Darryl Ashcraft ("Ashcraft") was a wireline operator employed by Alliance Energy, LLC ("Alliance Energy"), an independent contractor hired by Cantium to perform plug and abandonment work on Cantium's fixed platforms located on the Outer Continental Shelf ("OCS") off the coast of Louisiana.[1] Alliance Energy in turn subcontracted with Alliance Offshore, LLC ("Alliance Offshore") to provide the liftboat CHARLESTON ("CHARLESTON") and its crew and equipment for the job.[2] The CHARLESTON was equipped with a crane that was operated by crewmembers hired by Alliance Offshore and used during the plug and abandonment work.[3]

---

[1] Unsworn Declaration Under Penalty of Perjury of Chad Williams, Exh. 1, ¶ 8; Deposition of Chad Williams Depo, Exh. 2, pp. 13; 15.

[2] A liftboat is a self-propelled, self-elevating vessel used in support of various offshore mineral exploration and production or offshore construction activities.

[3] Deposition of Philip Coles, Exh. 3, pp. 20-21; Deposition of Craig Dickerson, Exh. 4, p. 103.

Cantium did not have any employees on the plug and abandonment job, but provided two "company men" whose sole purpose was to ensure that the work was performed in accordance with Cantium's permit that had been submitted to and approved by the Bureau of Safety and Environmental Enforcement ("BSEE").[4]

Prior to the accident, in preparation for removing the wellhead on the platform, Alliance Energy personnel had secured the crane's load line to the wellhead using slings owned by Alliance Energy. Subsequently, the licensed mate in charge of the CHARLESTON decided to raise the liftboat a couple of feet to prevent rising seas from striking its hull. The Cantium company man was not involved in this decision.[5] Unfortunately, and unbeknownst to the company man, the CHARLESTON's crane operator had failed to disconnect the crane's load line from the wellhead or let out enough slack prior to the lift.[6] As a result, when the liftboat was raised one of the slings attached to the wellhead was pulled so tight that it parted and struck Ashcraft in his arm.

It is undisputed that the Cantium company man on site at the time of the accident was not present for or involved in (1) attaching the slings to the wellhead; (2) the decision to raise the liftboat; (3) discussions between Alliance Offshore and Alliance Energy personnel regarding how the vessel operation was to be performed; or, (4) the operation itself.[7] Moreover, he was unaware (and had no reason to be aware) that the crane's load line was still attached to the slings when the liftboat was raised.[8]

---

[4] Williams Declaration, Exh. 1, ¶ 19; Dickerson Depo, Exh. 4, p. 98.

[5] Coles Depo, Exh. 3, pp. 17-18; 22; 34; Dickerson Depo, Exh. 4, pp.100; 102; 104.

[6] Dickerson Depo, Exh. 4, pp. 101; 109-110.

[7] Coles Depo, Exh. 3, pp. 17-18; 22; 26; 34; 37; 65-69; Dickerson Depo, Exh. 4, pp. 104-106.

[8] Dickerson Depo, Exh. 4, pp. 109-110.

Pursuant to the independent contractor defense under Louisiana law (or the general maritime law) a principle such as Cantium has no legal duty to employees of an independent contractor or subcontractor to protect against risks encountered in the performance of the contract work. *Coleman v. BP Expl. & Prod., Inc.*, 19 F.4th 720, 727 (5th Cir. 2021). Further, there is no evidence of any direct negligence by Cantium under either Louisiana or the general maritime law. There are no genuine issues of these material facts as to Cantium's liability and it is entitled to summary judgment as a matter of law. *Galbraith v. Constr. Tech. Servs., Inc.*, 2015 WL 542305, at *2 (M.D. La. Feb. 10, 2015) (citing *Iglesias v. Chevron U.S.A. Inc.*, 656 F. Supp. 2d 598, 601 (E.D. La.2009)).

## II.    PROCEDURAL HISTORY

Ashcraft sued his employer, Alliance Energy, and Cantium in State Court for the 19th Judicial District of East Baton Rouge Parish. The Petition alleges that during the night of April 24, 2021, due to increasing seas "a decision was made to raise the ALLIANCE lift boat further from the seas below."[9]  It further alleges that "as the lift boat was raised there was not sufficient slack given to the crane sling as the lift boat was raised" and that "[a]s a result, the sling-which was connected to the platform-tightened and eventually broke" striking Ashcraft in the arm causing his alleged injuries.[10] Ashcraft alleges that Cantium and Alliance Energy were negligent in various respects.

Cantium subsequently removed the case to this Court.  Plaintiff filed a Motion to Remand, which was granted and denied in part.  While the claims against Cantium remained in this Court, the claims against Alliance Energy were remanded to state court.[11] The state court lawsuit was

---

[9] *See* Notice of Removal, DN 1-1, Petition at p. 3, ¶ 11.

[10] *Id*.

[11] *See* DN 12.

transferred to the 17th Judicial District Court in Lafourche Parish, where it is currently pending. Ashcraft recently added Alliance Offshore, the CHARLESTON's owner/operator and employer of the crew, as a defendant in the state court suit where he is actively pursuing those claims.

## III.    UNDISPUTED FACTS

### A.  The Parties and the Contracts

Cantium owns and operates oil and gas platforms in the Gulf of Mexico.[12] Cantium does not specialize in or perform plug and abandonment operations and, instead, hires independent contractors to perform this work.[13] Cantium does not own or operate vessels or employ vessel crewmembers.[14] Alliance Energy specializes in well intervention, production, and decommissioning (plug and abandonment) work in the oil and gas industry.[15] Alliance Offshore specializes in providing marine transportation in support of the oil and gas industry.[16]

In February of 2021 Cantium hired Alliance Energy to perform plug and abandonment work on several wells located on Cantium platforms in Main Pass 41 on the Outer Continental Shelf ("OCS") off the coast of Louisiana.[17] Alliance Energy's work for Cantium was governed by a Master Contractor Services Agreement ("MCSA") dated November 2, 2017, and a Master Service/Purchase Order, dated February 9, 2021.[18] The MCSA provides that Alliance Energy is an independent contractor over which Cantium retained no direction or control:

> Contractor shall be an independent contractor with respect to performance of the Services, and **_neither Contractor nor anyone employed by Contractor or its_**

---

[12] Declaration of Williams, Exh. 1, ¶ 5.

[13] Declaration of Williams, Exh. 1, ¶ 6; Williams Depo, Exh. 2, pp. 64-66; Dickerson Depo, Exh. 4, p. 96.

[14] Declaration of Williams, Exh. 1, ¶ 7; Williams Depo, Exh. 2, pp. 64-66.

[15] Declaration of Frank Braud, Exh. 5, ¶ 5.

[16] Declaration of Jay Guidroz, Exh. 6, ¶ 5.

[17] Declaration of Williams, Exh. 1, ¶ 8; Williams Depo, Exh. 2, pp. 18-19.

[18] *See* MCSA between Cantium, LLC and Alliance Energy Services, LLC dated November 2, 2017, Exh. 7; Declaration of Braud, Exh. 5, ¶ 7; Declaration of Williams, Exh. 1, ¶ 9.

*subcontractors* shall be, act as, purport to act as or be deemed for any purpose to be the employee, agent, servant or representative of Company. ***Company shall have no direction or control of Contractor or its employees, agents, servants, representatives, or subcontractors, except in the results to be obtained***.

***The actual performance and supervision of all Services shall be by Contractor***, although Company shall have the right to inspect the Services as provided herein. Contractor shall be solely responsible for its employees' wages, benefits, withholding, and other personnel administration.[19]

As an independent contractor, Alliance Energy warranted its expertise in its plug and abandonment operations:

***Contractor represents that Contractor is fully experienced and properly qualified to perform the class of Services covered hereunder and that Contractor is properly licensed, equipped, organized, and finances to perform the Services***.[20]

\* \* \*

***Contractor warrants that is has the acquired experience and specialized knowledge in the field of oilfield services in which it is engaged.*** Contractor agrees to perform such Services in connection with Company's properties, projects and operations as Company may from time to time specify in written Service Orders issued by Company and accepted in writing by Contractor with reference to this Agreement. If the Service Order provides specific time frames for performance, Contractor shall perform them accordingly. If the Service Order provides for a Commencement Date and Completion Date, Contractor shall begin and complete performance of the Services on or before the specified dates.[21]

Alliance Energy also warranted that while on Cantium property it would follow, and ensure all members of its "Contractor Group," which includes its subcontractors such as Alliance Offshore, complied with the Alliance Energy and Cantium Health, Safety and Environmental Guidelines.[22] Alliance Energy agreed that if it retained subcontractors to perform part of the

---

[19] *See*, MCSA, Exh. 7, Clause 10 (emphasis added); Declaration of Williams, Exh. 1, ¶10.

[20] *See*, MCSA, Exh. 7, Clause 11.1; Declaration of Williams, Exh. 1, ¶11.

[21] *See*, MCSA, Exh. 7, Clause 2.2; Declaration of Williams, Exh. 1, ¶11; Declaration of Braud, Exh. 5, ¶ 11.

[22] *See*, MCSA, Exh. 7, Clauses 1.1(O); 13.1; and 13.2; Declaration of Braud, Exh. 5, ¶13. A "Subcontractor" is defined by the MCSA as "any Person who is engaged by Contractor, or any subcontractor of Contractor, to provide the Services…"). MCSA, Clause 1.1 (DD).

services Alliance Energy would "bind its Subcontractors and suppliers by written contract to observe all terms of this Agreement."[23] It was further provided that the MCSA "shall not create any contractual relationship between any such Subcontractors or suppliers and Company [Cantium]."[24] Alliance Energy also executed and agreed to follow (and bind its subcontractors to follow) Cantium's Safety and Environmental Management System Bridging Agreement, dated November 2, 2017, which required Alliance Energy and its subcontractors to abide by all applicable safety policies and practices.[25]

Under the "Master Service/Purchase Order" for the work being done at the time of the accident, Alliance Energy agreed to perform decommissioning work on multiple wells and to provide all plug and abandonment personnel, equipment, rentals and expendables, including the liftboat, needed for the work.[26] Alliance Energy subcontracted with Alliance Offshore for the use of the CHARLESTON for the job under a Master Time Charter Agreement ("MTCA") dated September 16, 2015, between Alliance Energy and Alliance Offshore.[27] The CHARLESTON was used to house and transport contractor personnel and equipment for the plug and abandonment job.[28] Its crew was comprised of a captain, mate, three deckhands, and two cooks, all of whom were employed by Alliance Offshore.[29] The vessel also had a deck crane that was operated by two of the deckhands employed by Alliance Offshore.[30]

---

[23] Declaration of Braud, Exh. 5, ¶14.

[24] *See* MCSA, Exh. 7, Clause 16.2; Declaration of Williams, Exh. 1, ¶14.

[25] *See* Safety and Environmental Management System Bridging Agreement dated November 2, 2017, Exh. 8; Williams Depo, Exh. 2, p. 22; Declaration of Williams, Exh. 1, ¶15, and Braud, Exh. 5, ¶15.

[26] *See* Master Service/Purchase Order, Exh. 9; Declarations of Braud, Exh. 5, ¶ 17 and Guidroz, Exh. 6, ¶ 6.

[27] *See* Master Time Charter Agreement ("MTCA") dated September 16, 2015, between Alliance Energy and Alliance Offshore, Exh. 10; Declaration of Braud, Exh. 5, ¶17; Williams Depo, Exh. 2, pp. 15-16; 32.

[28] Declaration of Williams, Exh. 1, ¶ 17.

[29] Declaration of Guidroz, Exh. 6, ¶ 9.

[30] Declaration of Guidroz, Exh. 6, ¶ 10.

The Alliance Energy/Alliance Offshore MTCA specifically provided that in "performing the services contemplated herein, OWNER [Alliance Offshore] **shall act as an independent contractor**."[31] It further provided that "CHARTERER [Alliance Energy] shall designate the work or services it desires performed, and the ultimate results it desires OWNER to obtain, **but shall leave to OWNER the method and details of performing such work or services, CHARTERER being interested only in the overall result obtained and having no control or supervision over or responsibility for the performance of such work or services, said control or supervision being retained solely and exclusively by OWNER**."[32] Finally, per the MTCA, Alliance Offshore agreed to provide a seaworthy vessel and a "skillful and qualified master and crew" to operate the vessel with "good seamanship."[33]

Cantium did not provide Alliance Energy or Alliance Offshore with any tools, personal protective equipment, or personnel to perform their jobs or retain the right to direct or control their work.[34] Cantium expected and indeed contractually required its contractors and subcontractors such as Alliance Energy and Alliance Offshore to have in place proper policies/procedures, to follow those policies/procedures, and to perform their operations safely.[35]

### B.  The Incident

Alliance Energy and Alliance Offshore had been performing decommissioning work on Cantium platforms for several months and had been at platform CA, well 30 ("CA-30") for about two days. Operations were conducted 24 hours a day, by day and night crews. Cantium had no

---

[31] *See* MTCA, Exh. 10, Clause 7 (emphasis added); Declaration of Guidroz, Exh. 6, ¶ 7.

[32] *Id*.

[33] *See* MTCA, Exh. 10, Clauses 4 and 5; Declaration of Guidroz, Exh. 6, ¶ 8.

[34] *See* MTCA, Exh. 10, Clause 10 (emphasis added); Declaration of Williams, Exh. 1, ¶¶ 18, 20.

[35] Declaration of Williams, Exh. 1, ¶¶ 11, 12; Williams Depo, Exh. 2, pp. 25-27; 64-66; Dickerson Depo, Exh. 4, pp. 52-53; 96-98; 100-101.

employees present but provided two independent contractor "company men" - one for the day shift and one for the night shift .[36] Their sole purpose was to ensure that the plug and abandonment jobs were performed in accordance with Cantium's work permit that had been submitted to and approved by the Bureau of Safety and Environmental Enforcement ("BSEE").[37] The company men did not control, direct, or supervise Alliance Energy and/or Alliance Offshore in the step by step process of performing the plug and abandonment work and/or operating the vessel for which Alliance Energy and Alliance Offshore had been specifically hired to perform.[38]

On the evening of April 24, 2021, Alliance Energy and Alliance Offshore were preparing to use the crane on the CHARLESTON to remove the wellhead from CA-30.[39] The Cantium night shift company man was Craig Dickerson. The Alliance Offshore/vessel night crew were the licensed mate Phillip Coles and deckhand/crane operator Gilbert Spears.[40] The Alliance Energy night shift personnel were supervisor Stephen Bankston, Nathaniel Holiday, David Hodge, and Ashcraft. The duties of Ashcraft, an experienced wireline operator, included generally rigging up/down equipment; monitoring pressure in the well and pressure control; and, operating his wireline unit during this process.[41] Ashcraft took directions from his Alliance Energy supervisor, Stephen Bankston.[42]

---

[36] Declaration of Williams, Exh. 1, ¶ 19; Dickerson Depo, Exh. 4, pp. 6-8; 17-18.

[37] Declaration of Williams, Exh. 1, ¶ 19; Williams Depo, Exh. 2, pp. 19-20; Coles Depo, Exh. 3, pp. 15-18; Dickerson Depo, Exh. 4, pp. 98-99.

[38] Williams Depo, Exh. 2, pp. 62-63; Dickerson Depo, Exh. 4, pp. 98-100; Coles Depo, Exh. 3, p. 66; Declarations of Williams, Exh. 1, ¶ 20, Braud, Exh. 5, ¶¶ 20-21, Guidroz, Exh. 6, ¶ 12.

[39] Williams Depo, Exh. 2, pp. 30, 41; Deposition of Darryl Ashcraft, Exh. 11, p. 81; Coles Depo, Exh. 3, p. 27.

[40] Coles Depo, Exh. 3, pp. 14-15; 21; 41.

[41] Ashcraft Depo, Exh. 11, pp. 67-69.

[42] Ashcraft Depo, Exh. 11, pp. 76; 93; 97.

In preparation for removing the wellhead the crane's load line had been secured to the wellhead using slings provided by Alliance Energy. Cantium was not involved in that process.[43] A moveable gangway that belonged to the CHARLESTON connected the vessel to the platform and had been secured on the platform with chain binders.[44] Cantium was not involved in setting up the gangway.[45]

At 5:30 p.m., per standard procedure, all night shift personnel participated in a safety meeting during which JSA's (job safety analyses) of Alliance Energy and Alliance Offshore were completed for the contractors' anticipated work, which included vessel crane operations, pumping operations, and removing the wellhead from the well.[46] A Cantium JSA/work permit was also completed.[47] There was no discussion about adjusting the liftboat during the meeting or with the company man Dickerson.[48]

At about 6:00 p.m., Mate Coles decided to raise the CHARLESTON a couple of feet to prevent rising seas from striking its hull, which can endanger the safety of the vessel.[49] Liftboat adjustments were not uncommon and had been done at prior platform locations for various reasons.[50] While he was on watch, Mate Coles had ultimate authority regarding decisions related to the liftboat, including adjusting its height.[51] He did not seek, nor did he need, Dickerson's

---

[43] Coles Depo, Exh. 3, p. 26.

[44] Coles Depo, Exh. 3, pp. 24-26.

[45] Coles Depo, Exh. 3, p. 26.

[46] Dickerson Depo, Exh. 4, pp. 34-42.

[47] Dickerson Depo, Exh. 4, pp. 34-35.

[48] Dickerson Depo, Exh. 4, p. 77; Coles Depo, Exh. 3, p. 34.

[49] Coles Depo, Exh. 3, pp. 22-23; Dickerson Depo, Exh. 4, pp. 58-60.

[50] Dickerson Depo, Exh. 4, pp. 43-44; 103-104.

[51] Coles Depo, Exh. 3, p. 22; Dickerson Depo, Exh. 4, pp. 108-109.

approval.[52] Although at some point before the operation Dickerson generally became aware that the liftboat would need to be adjusted, he did not know when this would occur, he deferred to Mate Coles as to timing and method of doing so, and he was not present for or involved in any discussions between Alliance Energy and Alliance Offshore regarding the operation.[53] Dickerson, who had worked with this vessel crew for some time, had no concerns about their ability to conduct the operation safely and expected they would do so on this occasion.[54]

Mate Coles discussed the plan to raise the CHARLESTON with his deckhand/crane operator Gilbert Spears who, in turn, discussed it with the Alliance Energy supervisor, Stephen Bankston.[55] Mate Coles instructed Spears to lower the crane's block and to put slack in its load line.[56] Mate Coles testified that it was his and Spears' responsibility to ensure there was enough slack in the crane's load line before the lift.[57] Mate Coles also instructed Spears to ask the Alliance Energy supervisor Bankston to have his workers release the chain binders securing the gangway to the platform in preparation for the lift.[58] Bankston ordered Ashcraft to release the binders.[59] After the binders were released, Spears gave Mate Coles the "go ahead" to raise the vessel.[60] Dickerson was not involved in any of these activities or discussions.

---

[52] Coles Depo, Exh. 3, pp. 17-18; 22; 34; Dickerson Depo, Exh. 4, pp.100; 102; 104.

[53] Coles Depo, Exh. 3, pp. 65-69; Dickerson Depo, Exh. 4, pp. 63-66.

[54] Dickerson Depo, Exh. 4, 96-101; 105-106.

[55] Coles Depo, Exh. 3, pp. 23-24; 28-29.

[56] Coles Depo, Exh. 3, pp. 23-24.

[57] Coles Depo, Exh. 3, pp. 37-38.

[58] Coles Depo, Exh. 3, pp. 23; 48.

[59] Ashcraft Depo, Exh. 11, pp. 93-95; 97-98.

[60] Coles Depo, Exh. 3, pp. 28-29.

From the wheelhouse Mate Coles could see the crane load line and slings attached to the wellhead and he believed there was sufficient slack in the load line for the lift.[61] He initially raised the liftboat roughly two feet without incident. Spears then determined that the liftboat needed to be raised another few inches to accommodate pallets under the end of the gangway on the vessel's deck.[62] Ashcraft was instructed to release the chain binders a second time, which he did.[63] Spears then gave Mate Coles the "go ahead" to raise the vessel a few more inches.[64] As soon as the second lift began, a sling attached to the wellhead broke striking Ashcraft, who was positioned near the wellhead.[65] Dickerson was in his office on the CHARLESTON working in preparation for removing the wellhead when the accident occurred.[66] He heard the sling snap and felt the liftboat shake.[67] It was only *after* the accident that Dickerson learned that, contrary to his expectations, the vessel crew had not disengaged the crane from the wellhead before the lift.[68]

Mate Coles blamed only himself and Spears for the incident, testifying that the accident happened because he and Spears had not ensured there was enough slack in the crane's load line before attempting the second lift.[69] He placed no blame on Cantium or Dickerson.[70] At the time of the accident, Alliance Offshore did not have a policy that required a new JSA for liftboat

---

[61] Coles Depo, Exh. 3, pp. 29-30; 69.

[62] Coles Depo, Exh. 3, pp. 30-32; 40; 48-49. The pallets were used to decrease the "step down" from the gangway to the vessel's deck.

[63] Ashcraft Depo, Exh. 11, p. 100.

[64] Coles Depo, Exh. 3, pp. 48-49.

[65] Ashcraft Depo, Exh. 11, pp. 100; 104-108.

[66] Dickerson Depo, Exh. 4, pp. 62-64; 68; 70; 74.

[67] Dickerson Depo, Exh. 4, pp. 69-70.

[68] Dickerson Depo, Exh. 4, p. 95.

[69] Coles Depo, Exh. 3, pp. 50-52; 62-63; 70- 71; Dickerson Depo, Exh. 4, p. 95.

[70] Coles Depo, Exh. 3, pp. 66; 69.

adjustments.[71] After the accident Alliance Offshore revised its standard operating procedure to require a new JSA for liftboat adjustments.[72] Neither Cantium nor Alliance Energy modified any of their procedures as a result of the accident.[73] Cantium was not cited by any regulatory authority as a result of the accident and Dickerson was not disciplined.[74]

## IV.    LAW AND ARGUMENT

### A.  Summary Judgment Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial."  *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002).  The issue of a party's entitlement to the independent contractor defense is appropriate for summary judgment where the material facts are not in dispute.  *See, e.g., Galbraith,* 2015 WL 542305 (J. Dick); *Iglesias v. Chevron U.S.A. Inc*., 656 F. Supp. 2d 598, 602 (E.D. La. 2009). Whether the defendant owed a duty to the plaintiff is a question of law for the Court. *Miss. Dep't of Transp. v. Signal Int'l LLC* (*In re Signal Int'l LLC*), 579 F.3d 478, 490 (5th Cir. 2009).

### I.    Applicable Law: Louisiana Law via OCSLA

This Court has already determined that jurisdiction under OCSLA has been satisfied.[75] Once OCSLA jurisdiction is established the Court turns "to the OCSLA choice of law provision

---

[71] Coles Depo, Exh. 3, pp. 69-70.

[72] Coles Depo, Exh. 3, pp. 50-52; Williams Depo, Exh. 2, pp. 58, 62.

[73] Declaration of Williams, Exh. 1, ¶ 21; Williams Depo, Exh. 2, p. 63.

[74] *Id*.

[75] See Magistrate Judge's Report and Recommendations, DN 12, pp. 3-6.

to ascertain whether state, federal, or maritime law applies to a particular case.'" *Petrobras Am., Inc. v. Vicinay Cadenas, S.A.*, 815 F.3d 211, 215 (5th Cir. 2016) (quoting *In re DEEPWATER HORIZON,* 745 F.3d 157, 164 (5th Cir.2014)). OCSLA's choice of law provision adopts the law of the adjacent state (here Louisiana law) as surrogate federal law, but only "[t]o the extent not inconsistent with … other Federal laws." 43 U.S.C. § 1333 (a)(2)(A). A separate three-part test first articulated by the Fifth Circuit in *Union Tex. Petr. Corp. v. PLT Eng'g, Inc*., 895 F.2d 1043, 1047 (5th Cir. 1990), determines whether state law applies:

> (1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law.

The first and third *PLT* factors require no discussion. Ashcraft was injured on a covered OCSLA situs,[76] and Louisiana negligence law is not inconsistent with federal law. *Coleman,* 19 F.4th 720, 727; *Fornah v. Schlumberger Tech. Corp.*, 737 F. App'x 677, 680 (5th Cir. 2018) (unreported decision).

It is the second factor – whether maritime law applies "of its own force" – that controls the choice of law here between either maritime law or Louisiana law as "surrogate federal law." This question depends on "whether the plaintiff's claims sound in admiralty." *Warner v. Talos ERT LLC*, 2022 WL 529351, at *2, n.2 (W.D. La. Feb. 22, 2022) (citing *United Texas Petroleum v. PLT Eng'g*, 895 F.2d. 1043, 1047 (5th Cir. 1990)). Maritime law and admiralty jurisdiction go hand in hand. For maritime law to apply "of its own force," the requirements of admiralty jurisdiction must be present, meaning there must be both a maritime location and a connection to a traditional

---

[76] "OCSLA specifically regards the artificial islands on the OCS as areas where state law should apply unless there is a conflict with federal law." *Dahlen v. Gulf Crews, Inc.*, 281 F.3d 487, 494 (5th Cir. 2002).

maritime activity. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 533-534 (1995); *Petrobras Am.*, 815 F.3d at 216. Neither element is met here.

The location test is satisfied if either (1) a tort occurred on navigable water, or (2) an injury suffered on land was caused by a vessel on navigable water. *Id.* Importantly, when determining whether a tort occurred on navigable water, "[t]he court must consider where the wrong 'took effect' rather than the locus of the tortious conduct." *Petrobras Am.*, 815 F.3d at 216 (citing *In re La. Crawfish Producers,* 772 F.3d 1026, 1029 (5th Cir.2014), and *Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey,* 183 F.3d 453, 456 (5th Cir.1999)). For example, in *Delozier v. S2 Energy Operating, LLC*, 498 F.Supp.3d 884, 890-91 (E.D. La. 2020), the court held the admiralty location test was not satisfied where a worker's injuries were sustained on an OCS fixed platform while disembarking the vessel and allegedly caused by the negligent operation of the crewboat: "Because the harm *took effect on the fixed platform*, the tort did not occur wholly on navigable water." *Id.* at 891 (emphasis added). Similarly, while Ashcraft claims the crew of CHARLESTON negligently failed to leave enough slack in the crane's load line before adjusting the CHARLESTON, the harm "took effect" on the CA-30 platform where Ashcraft was working when he was injured, thus the tort did not occur on navigable water.

Moreover, the facts do not fall within the Admiralty Extension Act, 46 U.S.C. § 30101(a). The Fifth Circuit has repeatedly held that the Extension Act applies only when the injury on land is caused by a defect in either the vessel itself or an appurtenance of the vessel. Negligence on the part of a vessel's crew does not implicate the Extension Act:

> In order to invoke maritime jurisdiction under the Extension Act, a plaintiff injured on shore must allege that the injury was caused by "a defective appurtenance of a ship on navigable waters." *Margin v. Sea-Land Services , Inc.*, 812 F.2d 973, 975 (5th Cir. 1987).

> …

Most recently, this Circuit interpreted the two Supreme Court decisions in *Victory* and *Guitierrez* stating that the Extension Act is meant to apply to the vessel and her appurtenances "and does not include those performing actions for the vessel." *Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey,* 183 F.3d 453, 456 (5th Cir.1999).

…

[T]he holding of this Circuit in *Egorov* makes it clear that for the Extension Act to apply, the defect must be in the appurtenance and not be due to the personnel performing services for the vessel.

*Dahlen v. Gulf Crews, Inc.*, 281 F.3d 487, 494 (5th Cir. 2002).

Ashcraft's Petition alleges that "as the lift boat was raised there was not sufficient slack given to the crane sling as the lift boat was raised" and that "[a]s a result, the sling-which was connected to the platform-tightened and eventually broke" striking Ashcraft in the arm causing his alleged injuries.[77] The allegation is of crew negligence in negligently failing to leave enough slack in the crane's load line before adjusting the vessel. There is no allegation (or actual evidence) that the CHARLESTON itself or its crane were defective. Although there is likewise no allegation that the sling that broke was defective, in any event it was owned by Alliance Energy and was not an appurtenance of the CHARLESTON.

The *Delozier* court's reasoning is again on point. Delozier sustained injuries on a platform due to alleged negligence by the vessel's crew. Rejecting application of the Extension Act, the court held:

In line with Supreme Court precedent, the Fifth Circuit has held "the Extension Act is meant to apply to the vessel and her appurtenances 'and does not include those performing actions for the vessel.'" "The vessel or its defective appurtenances must be the proximate cause of the accident." The alleged negligence in the instant case is Dauzat's operation of the M/V MISS MICHELLE, not defects in the vessel or its appurtenances. The location prong of the admiralty jurisdiction inquiry is not satisfied and general maritime law does not apply.

---

[77]*See* Notice of Removal, DN 1-1, Petition at p. 3, ¶11.

*Delozier*, 498 F.Supp.3d at 891-92 (quoting *Dahlen*, 281 F.3d at 494, and *Margin*, 812 F.2d at 975). Ashcraft's allegations of negligence by the CHARLESTON's crew do not invoke the Extension Act and do not satisfy the location requirement needed for admiralty jurisdiction.

Nor does this case have the required connection to traditional maritime activity. Ashcraft was working on the platform in preparation to remove the wellhead for plug and abandonment work when he was injured. The Supreme Court and other courts have concluded that work performed on oil production platforms affixed to the OCS is not maritime in nature because it is primarily related to oil and gas exploration. *Petrobras*, 815 F.3d at 218; *see also Thibodeaux v. Grasso Prod. Mgmt., Inc.*, 370 F.3d 486, 493 (5th Cir. 2004) ("Both this court and the Supreme Court have expressed the opinion that work commonly performed on oil production platforms is not maritime in nature.")(citing *Herb's Welding Inc. v. Gray*, 470 U.S. 414, 423–24, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985))). *See also, Fornah v. Tetra Applied Techs., LLC*, No. CV 16-14354, 2017 WL 4791176, at *2 (E.D. La. Oct. 23, 2017), *aff'd sub nom. Fornah v. Schlumberger Tech. Corp.*, 737 F. App'x 677 (5th Cir. 2018)(unreported)(where an independent contractor's employee working on the platform alleged he was injured in an operation involving the crane of the liftboat had no connection to traditional maritime activities).

Because the injury to Ashcraft did not involve (1) a tort on navigable water, (2) an injury suffered on land caused by a vessel defect on navigable water, or (3) have a connection to traditional maritime activities, maritime law does not apply "of its own force" and Louisiana law, adopted as surrogate federal law under OCSLA, governs the claim of Ashcraft against Cantium.

### A. Louisiana's Independent Contractor Defense Applies

Under Louisiana law "a principal generally is not liable for the offenses an independent contractor commits in the course of performing its contractual duties." *Ainsworth v. Shell Offshore*,

*Inc.*, 829 F.2d 548, 549 (5th Cir. 1987), *cert. denied*, 485 U.S. 1034 (1988). *See also*, *Galbraith v. Constr. Tech. Servs., Inc.*, 2015 WL 542305, at *2 (M.D. La. Feb. 10, 2015) (J. Dick) (citing *Iglesias v. Chevron U.S.A. Inc.*, 656 F. Supp. 2d 598, 601 (E.D. La. 2009)) (emphasis added)("It is a well-established rule under Louisiana law that a principal cannot be held liable for the negligent acts of its independent contractor in the course of performing a contract."). Moreover, "Louisiana law imposes no duty upon a principal to intervene or interject itself to stop the unsafe activities of its independent contractor, even if the principal's intervention could have prevented an accident." *Id.* (citing *Ainsworth.,* 829 F.2d 548, 551)(emphasis added). The independent contractor theory reflects the principle that normally the one employing an independent contractor is not under a duty to protect that independent contractor's employees from

injury in the course of the work under the contract. *Futo v. Lykes Bros. Steamship Co., Inc.*, 742 F.2d 209, 214 (5th Cir. 1984)*.*

There are two exceptions to the independent contractor defense, neither of which apply. First, a principal may not avoid liability for injuries resulting from a contractor's performance of "ultrahazardous activities" on behalf of the principal. *Roberts v. Cardinal Servs.*, 266 F.3d 368, 380 (5th Cir. 2001); *Ainsworth*, 829 F.2d at 549; *Coulter v. Texaco, In*c., 117 F.3d 909, 912 (5th Cir. 1997). There is no allegation that either operating a vessel or Ashcraft's plug and abandonment work is ultrahazardous. Offshore oil production itself is not an ultrahazardous activity. *Ukudi v. McMoRan Oil & Gas, L.L.C.*, 587 F. App'x 119, 122 (5th Cir. 2014). This exception is inapplicable.

Second, a principal may not avoid liability for its contractor's actions if it retains operational control over the contractor's work. *Roberts*, 266 F.3d at 380; *Coulter v. Texaco, Inc.*, 117 F.3d 909, 912 (5th Cir. 1997). The test for the "operational control exception first requires an

examination of whether and to what extent the right to control work has been contractually reserved by the principal." *Coulter*, 117 F.3d at 912.

Cantium did not retain operational control over the work of Alliance Energy or Alliance Offshore either contractually or in fact. The MCSA under which Alliance Energy and its subcontractors were working explicitly provided that Alliance Energy and its subcontractors (i.e. Alliance Offshore) were independent contractors over which Cantium did not retain a right of control: Cantium "***shall have no direction or control of Contractor or its employees, agents, servants, representatives, or subcontractors, except in the results to be obtained***."[78] In accord with the MCSA and the MTCA, the parties' conduct in practice was that Cantium, neither directly nor through it independent contractor company man, exercised operational control over either Alliance Energy or Alliance Offshore. The testimony of all witnesses including Ashcraft is consistent on this point.

The fact that the Cantium company man monitored the overall job does not alter this result. "[I]t is not enough for the principal to have a company man on the platform, rather, the principal must exercise *direct supervision* over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way." *Ukudi*, 587 F. App'x at 122 (emphasis added; citation omitted). *See also, Cormier*, 2013 WL 1567406, at *13 (W.D. La 2013)("That W&T monitored the drilling and casing work by having a drill consultant onsite does not mandate a conclusion that W&T retained control over casing operations."); *Graham v. Amoco Oil Co.*, 21 F.3d 643, 646 (5th Cir. 1994) (summary judgment was proper when the principal's "company man" on the platform did not participate in any decision-making process concerning the manner in which the independent contractor's team performed the task that led to the plaintiff's

---

[78] *See*, MCSA, Exh. 7, Clause 10 (emphasis added).

-18-

injury); *Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003) (the physical presence of

a representative of a principal is not sufficient to show supervision or control).

Further, "the fact that a principal takes an active interest in the safety of the employees of

its independent contractor does not, in and of itself, constitute direct operational control." *Cormier*,

2013 U.S. Dist. LEXIS 53416, at *39-40 (citing *Duplantis v. Shell*, 948 F.2d 187, 193 (5th Cir.

1991)). Instead, a principal exercises operational control only if it gives "an express or implied

order to the contractor to engage in an unsafe work practice leading to injury." *Fruge ex rel. Fruge

v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003).

Finally, this result is not altered even if Dickerson knew the liftboat was going to be raised.

There is no dispute that Dickerson was not aware that the vessel crew had not disconnected the

crane's load line from the wellhead before the vessel was raised. "Absent an express or implied

order to the contractor to engage in an unsafe work practice leading to an injury, a principal . . .

cannot be liable under the operational control exception." *Coulter v. Texaco, Inc.,* 117 F.3d 909,

912 (5th Cir. 1997). That argument was considered and rejected by the Fifth Circuit:

> The Coulters argue that just such an unusual circumstances was present here
> because Texaco engineers initially gave their consent to reposition the second Dual
> crane and replace it with the Texaco crane. The Coulters thus contend that this
> approval at least amounts to an implicit authorization of the configuration of the
> drill collar pipe rack with four rather than six posts. In and of itself, however, the
> consent of these Texaco engineers to the Dual–Texaco crane swap is insignificant
> because the Coulters have not pointed to any summary judgment evidence
> indicating that (1) Texaco knew, at the time the second Dual crane was removed,
> that the crane's pedestal was serving as two of the six posts for Dual 25's drill collar
> pipe rack, or (2) Dual was prevented by Texaco from making adjustments to the
> rack once the crane was moved and it should have become clear to Dual that the
> rack was unstable. Consequently, there is no evidence that Texaco itself either
> explicitly or implicitly authorized the initial destabilization, or continued unsafe
> use, of the drill collar pipe rack. We therefore conclude that the district court
> properly dismissed the Coulters' negligence claims against Texaco founded on
> Article 2315.

*Id.*; see also, *Ukudi*, 587 F. App'x at 122 (emphasis added; citations omitted)("The principal

exercises operational control ***only*** if it gives an express or implied order to the contractor to engage in an unsafe work practice leading to injury.").

The undisputed testimony is that Cantium (and Dickerson) expected both Alliance Offshore and Alliance Energy to have in place proper procedures for their operations and to follow their own procedures and perform their respective jobs safely.[79] He played no role in the decision to raise the liftboat or how that operation would be performed.[80] He did not see how much slack was in the crane's load line before the operation, and he had no idea that the crane's load line was still connected to the wellhead until after the accident had happened.[81]  Further, Dickerson had no duty to know these things since they were the operational activities for which Alliance Energy and Alliance Offshore had been specifically hired.

Application of the independent contractor defense as a basis for summary judgment in offshore oil and gas litigation is commonplace, and the doctrine operates here to shield Cantium from all liability arising from acts or omissions on the part of Alliance Offshore and/or Alliance Energy personnel.[82]

### B.  No Independent Negligence of Cantium

Finally, there is no evidence that Cantium was negligent. Under Louisiana law, negligence claims undergo a five-part analysis: (1) did the defendant owe a duty; (2) was that obligation

---

[79] Dickerson Depo, Exh. 4, pp. 96-98; 100-101.

[80] Dickerson Depo, Exh. 4, p.105; Coles Depo, Exh, 3, pp. 22; 65-67.

[81] Dickerson Depo, Exh. 4, p. 101.

[82] *See, e.g.*, *Iglesias*, 656 F. Supp. 2d 598, 601–02 (summary judgment was proper on operational control when the plaintiff testified that his supervisor instructed him to perform the task that ultimately led to his injury); *Hebert v. CXY Energy, Inc.*, 72 F. Supp. 2d 681, 687 (W.D. La. 1999) (summary judgment was warranted when the plaintiff was "supervised by an [independent contractor] employee, not a [principal] employee, in the course of painting and sandblasting operations which caused [the plaintiff] to help a co-employee move his pic board, the activity with which [the plaintiff] was involved immediately prior to his death.").

breached; (3) was the breach cause-in-fact of the plaintiff's injury; (4) was the breach the cause-in-law of the plaintiff's injury; and (5) did the plaintiff suffer actual damages. *Lemann v. Essen Lane Daiquiris, Inc.*, 2005-1095 (La. 3/10/06); 923 So. 2d 627, 633; *Hicks v. BP Expl. & Prod., Inc.*, 310 F. Supp. 3d 754, 759 (E.D. La. 2018) (quoting *Hanks v. Entergy Corp*., 944 So. 2d 564, 579 (La. 2006)); *Christy v. McCalla*, 2011-0366 (La. 12/6/11), 79 So. 3d 293, 299. A plaintiff must prove all five elements of his claim to succeed. Ashcraft's allegations of negligence in his Petition are generic and identical to his allegations against his employer Alliance Offshore. However because Cantium did not owe Ashcraft a duty and there was no breach of a duty, he cannot prevail as to Cantium under this theory either.

Whether a defendant owes a duty is a threshold question and is a question of law. *McCarroll v. Wood Grp, Mgmt. Servs., Inc.*, 561 F. App'x 407, 410 (5th Cir. 2014); *Mundy v. Dep't of Health & Hum. Res.*, 620 So. 2d 811, 813 (La. 1993). Under Louisiana law independent contractors "do not generally owe a duty to protect to the employee of another independent contractor beyond the exercise of ordinary care that is owed to the public generally." *McCarroll v. Wood Group Management Services, Inc*., No. 13-30891, 561 Fed. Appx. 407, 410 (5th Cir. 2014) (unpublished) (*citing Lafont v. Chevron, U.S.A*., 593 So. 2d 416 (La. App. 1 Cir. 1991), and *affirming* the district court, *McCarroll v. Seatrax Servs., Inc*., No. CIV.A. 12-2402, 2013 WL 3872219, at *4 (E.D. La. 2013)). Where, as here, "the activity at issue is not ultrahazardous, the principal has no duty to ensure, through instructions or supervision, that the independent contractor performs its obligations in a reasonably safe manner." *Hawkins v. Evans Cooperage Co., Inc.*, 766 F.2d 904, 908 (5th Cir. 1985) (citing *Hyde v. Chevron U.S.A., Inc.*, 697 F.2d 614, 630 (5th Cir. 1983); *McCormack v. Noble Drilling Corp.*, 608 F.2d 169, 175 (5th Cir. 1979); *Kent v. Gulf States Utilities Co.*, 418 So.2d 493, 500 (La. 1982)).

As the platform owner, Cantium "does not owe an independent contractor's employee a duty to provide a safe working environment." *Zeigler v. BP America Production Co*., 2006 WL 2850163, at \*3, (E.D. La. 2006), *aff'd*, 249 Fed. Appx. 999 (5th Cir. 2007) (citing *Graham,* 21 F.3d at 647. *See also Parker v. Petroleum Helicopters, Inc.*, 2002 WL 662921 (E.D. La. 2002). "[A] platform owner and principal owe no independent duty to exercise reasonable care to protect a contractor's employee from hazards created by the contractor." *Trosclair v. Shell Oil Co.*, 1997 WL 325371, at \*3 (E.D. La. 1997), *aff'd*, 138 F.3d 952 (5th Cir. 1998) (citing *Dupre v. Chevron U.S.A., Inc.*, 109 F.3d 230, 231 (5th Cir. 1997); *Graham*, 21 F.3d at 648; *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 551 (5th Cir. 1987).

### C.  <u>Summary Judgment Under Maritime Law is Appropriate</u>

Finally, even if maritime law were to apply, summary judgment is appropriate. Under the general maritime law, a principal "who hires independent contractors over which he exercises no operational control has no duty to discover and remedy hazards created by its independent contractors."[83] Louisiana's duty/risk negligence formulation is effectively identical to the federal maritime negligence standard, and would yield an identical result. *Fornah,* 737 F. App'x at 680. *See also, Barker v. Hercules Offshore, Inc.,* 713 F.3d 208, 214 (5th Cir. 2013)(choosing not to decide whether federal, state, or maritime law provides the substantive rule of decision for the plaintiff's OCSLA claim because the result is the same regardless of which law is applied).

Cantium respectfully submits there are no issues as to its liability under any applicable law and summary judgment is appropriate.

RESPECTFULLY SUBMITTED this 25th day of August, 2023.

---

[83] *Wallace v. Oceaneering Int'l*, 727 F.2d 427, 437 (5th Cir. 1984); *see also Landry v. Huthnance Drilling Co.*, 889 F. 2d 1469, 1471 (5th Cir. 1989); *Waggoner v. Wilson Welding*, No. 97-1899, 1998 WL 404653, at \*3 (E.D. La. July 16, 1998) (collecting cases).

MILLER HAHN, PLLC

 /s/ Stephanie D. Skinner
Stephanie D. Skinner (#21100)
Kent B. Ryan, (#18418)
Allan C. Crane (#23700)
365 Canal St., Ste. 860
New Orleans, LA 70130
Tele:   (504) 684-5044
Fax:    (866) 578-2230
Email:  kryan@millerlaw-firm.com
        sskinner@millerlaw-firm.com
        acrane@millerlaw-firm.com

**Attorneys for Defendant, Cantium, LLC**

CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of August, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to those who are on the list to receive e-mail notices for this case, having enrolled in this Court's CM/ECF program and otherwise consented to receive notice and service via CM/ECF. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all non-CM/ECF participants.

        /s/ Stephanie D. Skinner